**Duc HO, et al., Plaintiffs**

v.

**BARBER FOODS, Defendant**

**No. 00–282–P–DMC.**

United States District Court, D. Maine.

May 18, 2001.

---

Michael J. Waxman, Nicholas Bull, Thompson, Bull, Furey, Bass & Maccoll, LLC, P.A, Portland, ME, for Plaintiffs.

Graydon Stevens, Kelly, Remmel & Zimmerman, Portland, ME, for Defendants.

## MEMORANDUM DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [1]

COHEN, United States Magistrate Judge.

Barber Foods moves for summary judgment as to both counts filed against it by all four plaintiffs, current and former Barber Foods employees Duc Ho, Celso Florendo, Abdela Tum and Tadeusz Olszynski, in the instant national-origin discrimination case. Barber Foods' Motion for Summary Judgment, etc. ("Motion") (Docket No. 7) at 1–2; *Amended Complaint and Demand for Jury Trial* ("Complaint") (Docket No. 2). For the reasons that follow, the Motion is granted in part and denied in part.

### I. Summary Judgment Standards

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the govern-ing law if the dispute over it is resolved favorably to the nonmovant .... By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party ....' " *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995) (citations omitted). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, "the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995) (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548); Fed. R.Civ.P. 56(e). "This is especially true in respect to claims or issues on which the nonmovant bears the burden of proof." *International Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir.1996) (citations omitted).

### II. Factual Context

The parties' statements of material facts, credited to the extent that they are either admitted or supported by record citations in accordance with Loc. R. 56, and viewed in the light most favorable to the plaintiffs, reveal the following: [2]

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge David M. Cohen conduct all pro-ceedings in this case, including trial, and to order entry of judgment.

2. Barber Foods clarifies that although it disputes many of the specific incidents of alleged

## A. Facts Applicable to All Plaintiffs

Barber Foods is a processor of poultry-based, center-of-the-plate products. Defendant's SMF ¶1; Plaintiffs Tum and Ho's Opposing Statement of Material Fact ("Tum Opposing SMF") (Docket No. 13) ¶1; Plaintiffs Florendo's & Olszynski's Statement of Material Facts in Support of Objection to Motion for Summary Judgment ("Florendo Opposing SMF") (Docket No. 18) ¶1. Its production facilities are located at one site in Portland. *Id.* It employs approximately 750 associates, about forty-four percent of whom are foreign-born nationals, representing forty-eight different nationalities and more than fifty languages. *Id.*

Barber Foods has two production shifts. *Id.* ¶2. Both shifts have six lines—three specialty lines and three pack-out lines. *Id.* The product (*e.g.,* Chicken Kiev, Chicken Cordon Bleu) is assembled in the specialty lines. *Id.* It then moves into a large freezer and emerges onto the pack-out lines, where it is pouched, packed and palletized. *Id.*

Each line is run by a line lead who is responsible for the entire process on that line. *Id.* ¶3. The line leads report to the shift supervisor. *Id.* Production-line associates are organized into crews of approximately thirty associates each. *Id.* Each crew is headed by a crew lead. *Id.* The crew leads, who report to the shift manager, are responsible for the individual associates on their crews. The crews rotate to a different line every two hours. *Id.*

In addition to production-line associates, each line has set-up operators whose primary duties are to make sure that the various machines on the line are operating smoothly. *Id.* ¶4. The specialty lines have a forming machine that forms the basic product, *e.g.,* chicken fingers, nuggets or the patty for a stuffed product, as well as a stuffing machine and a breading machine. *Id.* The pack-out lines have a poucher, a boxer and a taper. *Id.* The set-up operators set the machines up for the particular product being run and then tend to the machines during production, making adjustments as directed to temperature, speed, resupply, thickening of the batter, etc., and correcting jams. *Id.* Although every associate has a primary job description, each is expected to be able to assist anywhere on the production line as directed by his or her line lead. *Id.* ¶5. The pack-out lines are very noisy, and all associates are required to wear hearing protection. *Id.* ¶7.

Prior to 1999 the set-up operators on the second shift were supervised by Alan Gilman and Tyrone Ive and were rotated among the six lines. *Id.* ¶6. All set-up operators were expected to be able to run all of the machines on both specialty and pack-out. *Id.* Effective December 28, 1998, and implemented in January/February 1999, Barber Foods changed the way the set-up operators were organized. *Id.* As of that date, each of the six line leads was assigned his or her own regular corps of set-up operators who, instead of rotating, were assigned more or less regularly to that line. *Id.* The purpose of the change was to develop more specialized knowledge and familiarity with the operation of the line to which the operator was assigned and to promote teamwork. *Id.* The change helped to eliminate redundant cross-training and unnecessary rotation of operators. *Id.* Each line was now assigned the maximum number of operators needed to meet the maximum production demands

harassment testified to by the plaintiffs, it accepts that testimony for purposes of summary judgment. Barber Foods' Statement of Material Facts in Support of Motion for Summary Judgment ("Defendant's SMF") (Docket No. 8) at 1.

of that line. *Id.* Oftentimes, this staffing level would not be required on a given line on a particular day, which would result in reassignment of one or more of the set-up operators to another job for that day. *Id.*

Maria Pulsoni has been employed at Barber Foods since 1978. *Id.* ¶ 8. She was initially a boning area associate and became boning area supervisor in 1990. *Id.* She became line lead of Pack-out # 2 on the second shift in 1995 and has remained in that position since. *Id.*

Each of the four plaintiffs at some point in time worked under Gilman as part of his crew. Plaintiffs Tum and Ho's Supplemental Statement of Material Fact ("Tum Additional SMF") (Docket No. 14) ¶ 19.[3] Gilman would arrange for a crew meeting at least once a month. *Id.* ¶ 24. The issue that would come up at every crew meeting was the way in which Pulsoni had been treating the crew members. *Id.* When the complaints first started coming in, Gilman reported them to his supervisor, Bill Whittier, and also Tom Page. *Id.* ¶ 25. But nothing ever changed. *Id.* When Gilman realized that nothing was being done, he decided not to waste his breath any longer and told his crew members that Pulsoni was not going to change and that they had to learn to deal with her. *Id.*

Gilman tried to discuss the complaints with Pulsoni at first, but she always had some excuse or brushed it off. *Id.* ¶ 26. Gilman had complaints from Tum and others that Pulsoni hollered at crew members, used a disrespectful tone of voice, would scream obscenities at them and would whistle at them. *Id.* ¶ 27. Gilman indicated that since he himself made Pulsoni aware of how her actions made the crew members feel, he believed that Pulsoni had to be aware of the consequences of her behavior to the employees. *Id.* ¶ 28.

On one occasion, Gilman witnessed Pulsoni grab one of the Asian production-line workers, pick her up and stuff her in a trash can. *Id.* ¶ 29. Gilman reported this incident to Whittier. *Id.* ¶ 30. Gilman testified that the reason Pulsoni "gets away with a lot of it" is because Asian women would never complain to anybody about it because they are so grateful to have a job. *Id.* ¶ 31. Ninety percent of the employees on the second shift are Asian. *Id.* ¶ 32. Of the seventeen crew members that Gilman had at Barber Foods, only three were not foreign-born. *Id.* ¶ 33.

The plaintiffs filed charges alleging national-origin discrimination with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC"). Defendant's SMF ¶ 25; Tum Opposing SMF ¶ 25; Florendo Opposing SMF ¶ 25. Tum, Olszynski and Ho filed their charges on April 5, 1999. *Id.* Florendo filed his charge on April 7, 1999. *Id.*[4]

---

**3.** Florendo and Olszynski expressly adopt the supplemental statement of material facts submitted on behalf of Tum and Ho. Plaintiffs Forendo's [sic] and Olszynski's Statement of Additional Material Facts ("Florendo Additional SMF"), Florendo Opposing SMF at 3–7, ¶ 27. Barber Foods submits no reply to any of the plaintiffs' statements of additional material facts. Per Local Rule 56(e), those facts are credited to the extent supported by the record citations given.

**4.** All four plaintiffs object to interjection of the further profered fact that the MHRC issued findings of no reasonable grounds to believe that unlawful discrimination had occurred in each case. Defendant's SMF ¶ 26; Tum Opposing SMF ¶ 26; Florendo Opposing SMF ¶ 26. Inasmuch as the substantive outcome of the MHRC proceedings is immaterial to the instant decision, I disregard that fact. I also omit mention of a statement of supplemental material facts submitted by Barber Foods, *see* Barber Foods' Supplemental Statement of Material Facts in Support of Sum-

### B. Facts Applicable to Plaintiffs Florendo and Olszynski

The line lead supervises the crew members when the crew is in her area. *Id.* ¶ 3. Line leads and crew leads are considered peers for purposes of supervisory authority. *Id.* Once production started, Pulsoni (the line lead) was the one who supervised the employees. *Id.* Line leads like Pulsoni make hiring and firing decisions. Florendo Additional SMF ¶ 2.

It was a characteristic of foreign-born people at Barber Foods that they would not complain about being mistreated. *Id.* ¶ 1. In the last ten years, only four Barber Foods employees above the line-lead and crew-lead levels were not born in the United States. *Id.* ¶ 3. They were born in Canada, England and Scotland. *Id.*

Florendo has been employed at Barber Foods since July 1994. Defendant's SMF ¶ 9; Tum Opposing SMF ¶ 9; Florendo Opposing SMF ¶ 9. He has always worked the second shift. *Id.* He was initially hired as a production-line associate and became a set-up operator in May 1995. *Id.* When set-up operators were reassigned to specific lines effective December 28, 1998, Florendo was given the choice of joining any of the three pack-out lines and chose Pack-out # 2, Pulsoni's line. *Id.* On April 4, 2000 Florendo was reassigned to Pack-out # 1, supervised by Victor Snow. *Id.* Florendo requested reassignment at that time because Pulsoni was "giving [him] a hard time already, more hard time." Florendo Additional SMF ¶ 11. He has remained on Pack-out # 1 since. Defendant's SMF ¶ 9; Tum Opposing SMF ¶ 9; Florendo Opposing SMF ¶ 9.

Florendo is from the Phillipines. *Id.* ¶ 13. He first came to the United States in 1988 at the age of twenty-eight. Florendo Additional SMF ¶ 4. At that time, he spoke very little English. *Id.* In the Phillipines, he held several jobs, including security guard, bus inspector and office clerk for a bus company. *Id.* Florendo's primary language is Tagalog. *Id.* ¶ 5. He also speaks English, although he sometimes confuses personal pronouns, using "he" when he means "she." *Id.;* Defendant's SMF ¶ 13; Tum Opposing SMF ¶ 13; Florendo Opposing SMF ¶ 13.

In the Phillipines, supervisors never yell at employees. Florendo Additional SMF ¶ 6. To correct someone, they call that person into the office and talk to that person individually. *Id.* In the Phillipines, supervisors never touch an employee in an offensive or unwelcome way, although they will tap someone politely on the shoulder to get his attention. *Id.* ¶ 7. In the Phillipines, people never call each other by pulling the index finger toward themselves. *Id.* ¶ 8. That is considered a very insulting, demeaning and obscene gesture. *Id.* In the Phillipines, people only whistle to call a dog. *Id.* ¶ 9. In the Phillipines, employees do not complain about how their supervisors treat them because that would create a serious risk of losing the job. *Id.* ¶ 10.

Florendo believes he has been discriminated against because of his national origin and identifies Pulsoni as the person who discriminated against him. Defendant's SMF ¶ 13; Tum Opposing SMF ¶ 13; Florendo Opposing SMF ¶ 13. He testified generally that Pulsoni would whistle, yell "hey" and/or beckon with her index finger when she wanted to get his attention. *Id.* He said she did this only to foreign-born nationals; she called native-born associates by name. *Id.* He testified that Pulsoni did not get impatient and yell at native-

mary Judgment (Docket No. 22), both because Local Rule 56 does not contemplate the proffer of additional material facts at this stage by a moving party and because those facts are in any event immaterial.

born associates. *Id.* He said she was polite to native-born associates but rude to those with accents. *Id.* Florendo testified that Pulsoni would grab the lapels of Asian associates when talking to them but not those of native-born associates; she never shouted or whistled at native-born associates or tapped them on the head to get their attention. *Id.* Pulsoni was physically abusive to Florendo. Florendo Additional SMF ¶ 13. She tapped him on the ears, tapped his hat, grabbed his coat and pushed him. *Id.*[5] Florendo found Pulsoni's words and actions toward him offensive and hostile, and he was embarrassed and humiliated by them. *Id.* ¶ 14.

Florendo testified to the following specific incidents of what he felt was discriminatory treatment toward him:[6]

1. Within the first year of Florendo's employment, while he was still a line worker, he was putting chicken on the line when Pulsoni came up and tapped his ears with her hand once to get his attention. Defendant's SMF ¶ 14(a); Tum Opposing SMF ¶ 14; Florendo Opposing SMF ¶ 14. He turned and asked her why she did that. *Id.* She did not say anything, but turned and left. *Id.* He believed at the time that she did this because of his national origin. *Id.*

2. While Florendo was still a line worker, he was working on a label machine. *Id.* ¶ 14(b). The machine broke down so that the labels had to be applied manually. *Id.* Pulsoni appeared beside him, grabbed the labels out of his hand, said he was going too slowly and started doing the labeling herself. *Id.* He believed at the time that she did this because of his national origin. *Id.*

3. Within the first three months of Florendo's becoming a set-up operator, while he was still in training, he was running the Thiele (box) machine. *Id.* ¶ 14(d). The shift supervisor informed Pulsoni that there were only five pieces of chicken in the box instead of six. *Id.* Pulsoni gestured with her index finger for Florendo to come to her and shook the box in front of him, angrily demanding to know why there were only five pieces in it. *Id.* She then grabbed Florendo's training manual, took it to her desk and started reading it. *Id.* He believed at the time that she did this because of his national origin. *Id.*

4. Sometime in 1997 Florendo was running the Thiele machine when it kept jamming with boxes. *Id.* ¶ 14(e). Pulsoni came up with her face inches from his and yelled, "asshole." *Id.* Florendo believed at the time that she did this because of his national origin. *Id.*

5. In March 1998 Florendo was running the doughboy machine when the freezer stopped. *Id.* ¶ 14(f). Pulsoni called him away from the machine and directed him to load chicken on the belt even though there were native-born line workers who could have done it. *Id.* Those workers laughed at him. *Id.* He was the only one ordered to put chicken on the belt. *Id.* He believed at the time that Pusloni did this because of his national origin. *Id.*

---

5. The statement of material facts refers to Pulsoni as having tapped Florendo's "hand," Florendo SMF ¶ 13; however, this is an apparent typographical error inasmuch as the cited record material states that she tapped his "hat."

6. I omit references to incidents in which Florendo was not chosen for Barber Foods positions for which he applied inasmuch as Florendo clarifies that he no longer presses claims of discrimination based on those facts. Plaintiffs Celso Florendo's and Tadeusz Olszynski's Memorandum in Opposition to Defendant Barber Foods' Motion for Summary Judgment ("Florendo SJ Opposition") (Docket No. 17) at 3.

6. One time while Florendo was working on the poucher, where the operator periodically has to check the metal detector paper, Pulsoni yelled, "Hey, can I see that paper?" *Id.* ¶ 14(g).

7. Once while Florendo was running the Thiele machine, Pulsoni came up and rapped three times on his plastic hat with her pencil to get his attention. *Id.* ¶ 14(h).

8. Pulsoni was giving Florendo instructions regarding a particular machine when he interrupted her. *Id.* ¶ 14(i). She grabbed his outer coat by the lapels and yelled, "Listen to me." *Id.* He gave her a warning look, and she let go and walked away. *Id.* This happened numerous times. *Id.*

9. In summer 1998 Florendo was running the Thiele machine when he felt a push in his back. *Id.* ¶ 14(j). He turned around, and Pulsoni asked him why he had slowed down the machine. *Id.* He said another associate had done it, and she walked away. *Id.*

10. Sometime after the MHRC hearing in the case, Florendo was waiting in the cafeteria to see if anyone had any questions concerning his paperwork. *Id.* ¶ 14(m). Inasmuch as it usually took fifteen to twenty minutes for someone to review the paperwork and the shift had ended, he had gone down to the cafeteria rather than wait upstairs. *Id.* A Cambodian co-worker had come with him but was outside smoking. *Id.* Pulsoni came down to the cafeteria, asked him what he was doing and told him to wait upstairs. *Id.* She did not tell the Cambodian worker to go back upstairs. *Id.*

Florendo did not understand that discriminating against and harassing someone because of that person's national origin was illegal in the United States until about two weeks before he consulted attorney Nicholas Bull in December 1998. Florendo Additional SMF ¶ 15.

Olszynski has been employed at Barber Foods since September 1991. Defendant's SMF ¶ 10; Tum Opposing SMF ¶ 10; Florendo Opposing SMF ¶ 10. He has always worked the second shift. *Id.* He was initially hired as a production-line associate and became a set-up operator within a few months. *Id.* When set-up operators were reassigned to specific lines effective December 28, 1998, Olszynski chose to join Pack-out # 1, supervised by Snow. *Id.* He has remained there since. *Id.* Olszynski sought and received transfer to a different pack-out line so as not to have to work under Pulsoni. Florendo Additional SMF ¶ 19. Since that time he has refused assignments to work on Pulsoni's line. *Id.* ¶ 20.

Olszynski is from Poland and speaks Polish, Russian and English, although he has some difficulty with English. *Id.* ¶ 16; Defendant's SMF ¶ 17; Tum Opposing SMF ¶ 17; Florendo Opposing SMF ¶ 17. He first came to the United States in 1989 at the age of thirty. Florendo Additional SMF ¶ 16. At that time he did not speak any English. *Id.* He had left Poland in 1986 and spent two years in a refugee camp in Italy. *Id.* In Poland, he owned a business selling fresh waffles from a kiosk. *Id.* ¶ 17. He also worked in an electronics factory and was a member of the Solidarity movement. *Id.* In Poland, whistling is the same as "booing" is in the United States. *Id.* ¶ 18. You would never whistle directly at an individual. *Id.* People whistle at dogs and pigeons. *Id.*

Olszynski believes he has been discriminated against because of his national origin, and identifies Pulsoni as the person who discriminated against him. Defendant's SMF ¶ 17; Tum Opposing SMF ¶ 17; Florendo Opposing SMF ¶ 17. Olszynski testified that Pulsoni constantly

whistles at him and treats people like dogs. *Id.* She whistles at almost everybody, but "most of us are foreigners." *Id.* She whistles, taps people with her pen or pencil and pulls their coats almost constantly. *Id.* If Olszynski has a problem with his machine, she stands next to him and glares at him; if his machine is running smoothly, she yells at him for standing there doing nothing. *Id.* Pulsoni frequently treated Olszynski in an abusive and hostile manner, which embarrassed and humiliated him. Florendo Additional SMF ¶ 22. Olszynski has believed since 1991 that Pulsoni's treatment of him was based on his national origin. Defendant's SMF ¶ 18; Tum Opposing SMF ¶ 18; Florendo Opposing SMF ¶ 18. He testified to the following specific incidents of what he felt was discriminatory treatment toward him:

1. In 1991, while Olszynski was working in the boning area, Pulsoni was his supervisor. *Id.* ¶ 18(a). She asked if he knew how to sharpen knives. *Id.* When he demonstrated, she said, "You don't know how. Where are you from?" *Id.* When he replied that he was from Poland, she looked at him like he was from another planet. *Id.*

2. In 1995 Pulsoni accused Olszynski of being late for work when he was not tardy. *Id.* ¶ 18(b). He pointed out that he was not late, and she turned and walked away. *Id.* He believed at the time that Pulsoni did this because of his national origin. *Id.*

3. In 1995 Olszynski received a written warning for improper adjustment of the Thiele machine and was suspended for two days. *Id.* ¶ 18(c). Pulsoni told his supervisor to write him up. *Id.* Following his complaint to the shift manager and human resources director, the suspension was lifted and he was reimbursed 150% of the wages he had lost. *Id.* The human resources director explained that the suspension was reversed because instructions were not clear about when he had to call maintenance for adjustments. *Id.* He believed at the time that Pulsoni caused him to be written up because of his national origin. *Id.*

4. Sometime in 1996 Olszynski was working on the poucher when it jammed. *Id.* ¶ 18(d). Pulsoni asked if he needed maintenance, and he said no. *Id.* She called maintenance anyway, three people came up, and they were upset because there was no need for them to be there. *Id.*

5. In November 1997 Olszynski was sent home for refusing an order from his supervisor. *Id.* ¶ 18(e). An associate was having a problem with the poucher. *Id.* Olszynski told Pulsoni to call maintenance. *Id.* She replied, "Don't worry, you're not his trainer." *Id.* A half hour later, the associate was still having problems, so Pulsoni told Olszynski to go over and fix the problem. *Id.* He refused, saying that she had told him earlier that it was not his problem. *Id.* Pulsoni told his supervisor (Gilman), and he was sent home. *Id.* He believed at the time that she did this because of his national origin. *Id.*

6. In November 1998 Olszynski was running the Thiele machine when Pulsoni turned it off and told him to go to another place on the line and bulk chicken. *Id.* ¶ 18(f). There were fifteen other associates standing around who could have done it, but she picked him. *Id.* He and three others bulked chicken while the other workers laughed. *Id.* Pulsoni told him, "Don't even try to talk to Tom Page [the shift manager] about this." *Id.* Olszynski reported Pulsoni's behavior to Page despite that warning. Florendo Additional SMF ¶ 24. He also complained to Gilman and Page about Pulsoni's treatment of him and told Page this was due to his national

origin. *Id.* ¶ 25.[7]

7. After Olszynski had transferred to Pack-out # 1 Pulsoni once came over and took the poucher film from his machine. Defendant's SMF ¶ 18(g); Tum Opposing SMF ¶ 18; Florendo Opposing SMF ¶ 18. When he asked her why she was taking it, she flipped him the finger. *Id.*

8. Another time after Olszynski had transferred to Pack-out # 1, his machine was down and chicken was piling up on the line. *Id.* ¶ 18(h). In those circumstances, it is necessary to pack the chicken up and get it back into the freezer. *Id.* Pulsoni came over to his line and stood with her arms crossed, not saying anything and staring at him for five minutes. *Id.*

9. On another occasion after Olszynski had transferred to Pack-out # 1, he went back to Pack-out # 2 to help another operator who asked for help on his machine. *Id.* ¶ 18(i). Pulsoni went to Olszynski's supervisor (Snow) and told him she did not want to see Olszynski in her area anymore. *Id.*

10. After the MHRC rendered its findings in the case, Olszynski saw Pulsoni when he was going to Pack-out # 1, and she smiled and did a little dance. *Id.* ¶ 18(j).

Olszynski did not understand that discriminatory and harassing conduct by a supervisor could be the basis for a legal claim until he spoke with other friends about what was happening to him. Florendo Additional SMF ¶ 26. This happened just a few weeks before he first consulted with attorney Nicholas Bull in December 1998. *Id.*

## C. Facts Applicable to Plaintiffs Tum and Ho

Ho became employed at Barber Foods in October 1993. Defendant's SMF ¶ 11; Tum Opposing SMF ¶ 11; Florendo Opposing SMF ¶ 11. He always worked the second shift. *Id.* He was initially hired as a production-line associate and became a set-up operator in November 1995. *Id.* He was a Rheon machine specialist at various times in 1997. *Id.* Other than this, he remained a set-up operator until his resignation from Barber Foods on October 24, 1998. *Id.* Barber Foods considered Ho a good worker at all times. Tum Additional SMF ¶ 3.

Ho came to the United States from Vietnam in 1991. *Id.* ¶ 1. He speaks Vietnamese and a little English, although he does not speak English well. *Id.* ¶ 2; Defendant's SMF ¶ 19; Tum Opposing SMF ¶ 19; Florendo Opposing SMF ¶ 19. He believes he has been discriminated against because of his national origin and identifies Pulsoni as the person who discriminated against him. Defendant's SMF ¶ 19; Tum Opposing SMF ¶ 19; Florendo Opposing SMF ¶ 19. Ho testified generally that Pulsoni would never use his name, but always yelled, "hey," when she wanted his attention. *Id.* She always insisted that paperwork be done her way even though it was not the way he had been trained and other supervisors had no problem with it. *Id.* She would ignore the schedule and tell him she did not like him working for her. *Id.* She would send him away, and Gilman would reassign him elsewhere. *Id.* Ho believed from the very first incident that Pulsoni treated him this way because of his national origin. *Id.*

---

**7.** Olszynski asserts that he told both supervisors that this treatment was due to his national origin, Florendo Additional SMF ¶ 25; however, the cited record material indicates that he told only Page.

Ho testified to the following specific incidents of what he felt was discriminatory treatment toward him:

1. Sometime in 1996 or 1997 Pulsoni told him to work somewhere else despite the fact that he was scheduled to work in her area. *Id.* ¶ 20(a). He came in before his shift, checked the schedule and reported where the schedule directed. *Id.* When the shift began, Pulsoni pointed a finger in his face and told him she did not want him working there no matter what the schedule said. *Id.*

2. While Ho was doing the "specialist" job, shift manager Page told him to turn his paperwork in to Pulsoni. *Id.* ¶ 20(b). Ho put the paperwork on her desk, but Pulsoni told him she wanted it given to her personally. *Id.* On two or three occasions, when Ho was ready to hand in his paperwork, he followed Pulsoni around the line "as if I was a dog" before she would take the paperwork from him. *Id.* This occurred in 1997. *Id.*

3. Ho apparently called maintenance once to open a set of doors that must be opened by maintenance only. *Id.* ¶ 20(c). Pulsoni beckoned him with her index finger and told him that she was the only one with the right to call maintenance. *Id.*

4. On one occasion, Ho and another associate were running identical machines. *Id.* ¶ 20(d). Pulsoni came over and ordered Ho to switch machines with the other associate. *Id.* Inasmuch as the machines were identical, Ho cannot think of any reason she did it except to give him a hard time. *Id.*

5. Pulsoni insisted that the paperwork be done her way. *Id.* ¶ 20(e). One day, while Ho was working in Pack-out # 1, Pulsoni came over from her line and checked his paperwork. *Id.* She tapped his hat three times with her pen and asked why he did it that way. *Id.* She hit the table with her hand and asked if he wanted to take the training course again. *Id.*

6. Approximately one week before Ho resigned, he was running the Thiele machine. *Id.* ¶ 20(f). He was changing products, so he needed a different tape size. *Id.* He left the machine to get the tape, and Pulsoni yelled at him and asked where he was going when he was supposed to be working. *Id.* She told him to ask her if he had to go somewhere. *Id.* Ho cried and gave his seven-day notice that day. *Id.*

7. Two days later, Ho's supervisor told him to work on the line in Pulsoni's area when there was no set-up work in his area. *Id.* ¶ 20(g). When he reported to the line, Pulsoni yelled at him to go someplace else. *Id.* This was the last straw, and he quit. *Id.*

Although, at deposition, Ho identified seven specific incidents of Pulsoni's abusive behavior, he is certain that there were many more incidents that he simply cannot recall at this time. Tum Additional SMF ¶ 4. Ho recalls that Pulsoni's abuse became consistent and frequent as time went by. *Id.* At some point Pulsoni targeted Ho and launched a consistent attack against him, criticizing him, humiliating him and generally poisoning the workplace for him. *Id.* ¶ 5. Pulsoni's abuse became unbearable for Ho, and he realized that he had to leave or put his own mental health at risk. *Id.* ¶ 6.

Ho complained to Gilman that Pulsoni did not treat him right, "ran him off" her machine, and would holler and swear at him and demean him. *Id.* ¶ 20. Ho complained about Pulsoni to Gilman approximately six times. *Id.* ¶ 21. Pulsoni's treatment of Ho in a negative manner had been going on fairly steadily over a period of time. *Id.* ¶ 22. Gilman did not report Ho's complaints about Pulsoni to anyone else at Barber Foods. *Id.* ¶ 23.

Tum has been employed at Barber Foods since March 1990. Defendant's SMF ¶ 12; Tum Opposing SMF ¶ 12; Florendo Opposing SMF ¶ 12. He worked the second shift until November 7, 1998. *Id.* He was initially hired as a production-line associate and became a set-up operator in October 1990. *Id.* He remained a set-up operator until November 4, 1997, when he became a production-line associate again. *Id.* Effective November 7, 1998 Tum transferred to the first shift. *Id.* He has remained there since. *Id.*

Tum immigrated to the United States from Ethiopia in 1990. Tum Additional SMF ¶ 7.[8] He speaks Amharic and some English, although he does not speak English well. *Id.* ¶ 8; Defendant's SMF ¶ 21; Tum Opposing SMF ¶ 21; Florendo Opposing SMF ¶ 21. Tum believes that he was discriminated against because of his national origin and identifies Pulsoni, Tyrone Ive and Gilman as the persons who discriminated against him. Defendant's SMF ¶ 21; Tum Opposing SMF ¶ 21; Florendo Opposing SMF ¶ 21. Tum testified that Pulsoni was always yelling and screaming at him, that she was always moving him around contrary to the schedule and telling Gilman that she did not want him in her area, and that she would follow him around always telling him what to do. *Id.* When Tum was a set-up operator, he believed "100 percent" at that time that Pulsoni treated him this way because of his national origin. *Id.* Pulsoni's verbal abuse—yelling and screaming at Tum in the workplace in a disrespectful and mean tone—embarrassed and humiliated Tum. Tum Additional SMF ¶ 12.

Tum testified to the following specific incidents of what he felt was discriminatory treatment toward him by Pulsoni:

1. In 1993 Pulsoni kept giving him a hard time, saying "don't do this, don't do that." Defendant's SMF ¶ 22(a); Tum Opposing SMF ¶ 22; Florendo Opposing SMF ¶ 22. Ive and Gilman asked if he wanted to move to the boning area to get away. *Id.*

2. In June or July 1997 he was working on the doughboy machine when Pulsoni came up to him, yelled, "I hate your face," and told him to leave her area. *Id.* ¶ 22(b). Tum's face happens to be dark black. Tum Additional SMF ¶ 11. Tum believed at the time that she did this because of his national origin. Defendant's SMF ¶ 22(b); Tum Opposing SMF ¶ 22; Florendo Opposing SMF ¶ 22. Pulsoni ran Tum off her production line on more than one occasion even though Gilman had assigned him to work there. Tum Additional SMF ¶ 10.

Tum testified that Gilman treated him discriminatorily by not doing anything about his complaints concerning Pulsoni and by not training him properly, always looking for his weak points. Defendant's SMF ¶ 23; Tum Opposing SMF ¶ 23; Florendo Opposing SMF ¶ 23. Gilman was not his supervisor after November 1997. *Id.* Tum believed at the time that Gilman did this because of his national origin. *Id.*

Tum testified that Ive discriminated against him by degrading and insulting him and by calling him Abdela "Dumb" over the PA system. *Id.* ¶ 24. This occurred in 1997, while he was a set-up operator. *Id.*

Both Tum and Ho feel that Pulsoni intentionally harassed, humiliated and abused them during the time they worked with her at Barber Foods. Tum Additional SMF ¶ 13. Both Tum and Ho witnessed Pulsoni target other foreign-born employees at Barber Foods for the same abusive

---

8. Tum's assertion that he immigrated from Sudan as well as Ethiopia is not supported by the record material cited. Tum Additional SMF ¶ 7.

treatment. *Id.* ¶ 14. Neither Tum nor Ho ever witnessed Pulsoni level the same abusive behavior against American employees at Barber Foods. *Id.* ¶ 15. Both Tum and Ho state that on the occasions when Pulsoni ran them off her line, she replaced them with non-foreign-born workers. *Id.* ¶ 34.

Although Tum and Ho testified that they always felt Pulsoni's abuse was discriminatory or on account of their national origin, neither had any idea that such abusive behavior gave rise to any legal claim on their behalf. *Id.* ¶ 16. Neither understood until long after the abuse began that he had any recourse beyond informing other supervisory or management people at Barber Foods, such as Gilman, Page or Whittier. *Id.* ¶ 17.

### III. Analysis

The plaintiffs allege that Barber Foods unlawfully discriminated against them on the basis of their national origin in violation of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e–2 *et seq.* (Count I) and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4571 *et seq.* (Count II). Complaint ¶¶ 30–33. They ground their case on a theory of hostile work environment. Plaintiffs Duc Ho and Abdella [sic] Tum's Memorandum in Opposition to Defendant Barber Foods' Motion for Summary Judgment ("Tum SJ Opposition") (Docket No. 12) at 1; Florendo SJ Opposition at 1. The parties make no distinction between federal and MHRA analysis. Motion at 3; Tum SJ Opposition at 1–3; Florendo SJ Opposition at 1–3. I shall accordingly likewise treat the MHRA claim as subsumed in the federal cause of action. *See CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.,* 888 F.Supp. 192, 203 (D.Me.1995), *aff'd,* 97 F.3d 1504 (1st Cir.1996).

■ To succeed on a hostile work environment claim, a plaintiff must show:

(1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome ... harassment; (3) that the harassment was based upon [national origin]; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that ... [the] objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*O'Rourke v. City of Providence,* 235 F.3d 713, 728 (1st Cir.2001).

■ "In hostile environment cases, the fourth and fifth elements are typically the most important." *Id.* "They must be determined by the fact-finder in light of the record as a whole and the totality of the circumstances." *Id.* (citation and internal quotation marks omitted). "Several factors typically should be considered in making this determination: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 729 (citations and internal quotation marks omitted). As to the sixth element (employer liability), "where there is an actionable hostile environment attributable to a supervisor, an employer is subject to vicarious liability to a victimized employee where ... it fails to exercise reasonable care to prevent it." *Id.* at 736.

■ A plaintiff proves the existence of a hostile work environment by showing that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's em-

ployment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations and internal quotation marks omitted). "[The] conduct must be extreme to amount to a change in the terms and conditions of employment;" the standard is "sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citations and internal quotation marks omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not sufficient. *Id.* (citation and internal quotation marks omitted). "Properly applied, [these standards] will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (citation and internal quotation marks omitted).

Barber Foods seeks summary judgment as to all of the plaintiffs' claims on the grounds that (i) many of the alleged instances of harassment are time-barred; (ii) those claims that are not time-barred are insufficient as a matter of law to establish an actionable hostile work environment; (iii) the evidence is insufficient as a matter of law to establish unlawful discrimination with respect to Florendo's job bids; and (iv) the evidence is insufficient as a matter of law to establish that Ho was constructively discharged. Motion at 3.

For the reasons set forth below, the first and fourth points ultimately are unpersuasive. The second point fails inasmuch as it hinges entirely on the success of the first.[9] Florendo concedes the third point, withdrawing that basis for his complaint. *See* Florendo SJ Opposition at 3 ("Mr. Florendo withdraws any claim of discrimination due to a failure to promote him to another position within the defendant company.").

■ Turning to the first point, an employment-discrimination charge that is first filed with an appropriate state agency must be filed with the EEOC within 300 days of the alleged discrimination. *Provencher v. CVS Pharm.*, 145 F.3d 5, 13 (1st Cir.1998) (citing 42 U.S.C. § 2000e–5(e)). On this basis, Barber Foods asserts that any alleged conduct occurring before the cutoff date of June 9, 1998 in the case of Olszynski, Tum and Ho, and June 11, 1998 in the case of Florendo, is not actionable. Motion at 6. The plaintiffs counter that conduct occurring prior to the cutoff dates may yet be reeled back into consideration via the mechanism of the "serial violation" exception to the cutoff rule. Tum SJ Opposition at 2–3; Florendo SJ Opposition at 1.

■ The serial-violation doctrine "allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors the earlier claims." *O'Rourke*, 235 F.3d at 730 (citation and internal quotation marks omitted). Three

---

**9.** As Barber Foods itself frames the second point, "[T]he claims of discriminatory harassment not barred by the statutes of limitations are insufficient as a matter of law to establish an actionable hostile working environment." Motion at 3. Barber Foods does not contend that the alleged incidents as a whole (including those assertedly time-barred) are insufficient to make out a claim of a hostile work environment. *See generally id.;* Barber Foods' Reply Memorandum in Support of Motion for Summary Judgment ("SJ Reply") (Docket No. 21). Nor does it argue that, on the totality of the evidence, the plaintiffs fail to present a triable issue whether the conduct of which they complain was motivated by national-origin animus. *Id.*

criteria are relevant to determination whether a plaintiff has alleged a viable claim:

1) is the *subject matter* of the discriminatory acts sufficiently similar that there is a substantial relationship between the otherwise untimely acts and the timely acts?

2) are the acts isolated and discrete or do they occur with *frequency* or repetitively or continuously?

3) are the acts of *sufficient permanence* that they should trigger an awareness of the need to assert one's rights?

*Id.* at 731 (emphasis in original; citations omitted). Barber Foods challenges the application of the serial-violation theory in this case on the third criterion, noting that as to the vast majority of otherwise time-barred claims, the plaintiffs themselves testified that they contemporaneously perceived Pulsoni's harassment as national-origin discrimination. Motion at 8–10, 13, 15–16, 18–20.[10]

In arguing that this contemporaneous awareness alone justifies summary judgment in its favor, Barber Foods misapprehends the nature of the applicable test. As the First Circuit clarified in *O'Rourke*, the question is "whether the earlier acts were sufficient to put [the plaintiffs] on notice that [they] had a substantial, actionable claim and should have complained earlier." *Id.* at 731–32. Regardless of whether the plaintiffs did, or did not, contemporaneously perceive individual early episodes of harassment as stemming from national-origin animus, they cannot fairly be said to have been put on notice of a need to assert rights that had not yet accrued. *See O'Rourke,* 235 F.3d at 732 ("It would be anomalous to say that, for statute of limitations purposes, a plaintiff should be on notice that she has a discrimination claim where the substantive law says she does not have such a claim yet. Here, the relevant law makes clear that often a sexual harassment claim will not accrue until after a period of recurring acts of harassment."). Barber Foods does not argue that as of June 1998 the alleged harassment was sufficiently severe and pervasive in the case of any or all of the plaintiffs to have been actionable. Nor, from the record presented on summary judgment, is it clear that this was so. Barber Foods accordingly fails to demonstrate its entitlement to summary judgment on this point. *See id.* at 727 ("Unless there are no material facts in dispute permitting resolution as a matter of law as to whether a continuing violation occurred, it is a jury issue.").[11]

10. Barber Foods makes one additional argument implicating the first two criteria of the serial-violation test: that Tum's allegations regarding Ive's conduct cannot constitute a "serial violation" inasmuch as "there is no allegation that Tyrone Ive did anything to Tum within the limitations period, let alone anything linked by similarity, repetition, or continuity to calling him 'Dumb' in 1997." Motion at 20. The plaintiffs seek to hold Barber Foods, rather than individual supervisors, liable. The test as explicated in *O'Rourke* is not whether the conduct of a particular supervisor fell within the limitations period, such that it could anchor past instances of discrimination on the part of that supervisor, but rather whether "the *subject matter* of the discriminatory acts [is] sufficiently similar" and "the acts ... occur with *frequency* or repetitively or continuously." *O'Rourke,* 235 F.3d at 731 (emphasis in original). The insult in question, while allegedly perpetrated by Ive, has a flavor similar to that of the ongoing demeaning conduct that Tum ascribed to Pulsoni.

11. In its reply memorandum, Barber Foods relies on a line of First Circuit cases concerning the doctrine of "equitable tolling" for the proposition that the plaintiffs' ignorance of their legal rights did not excuse their failure to file within the applicable limitations period. SJ Reply at 1–4. The doctrine of "equitable tolling," which is not relied upon by any

■ Barber Foods' loss on its first point dooms its second, which (as mentioned above) relies on a finding that the earlier incidents were time-barred. Florendo having conceded the third point (regarding job bids), it remains only to consider Barber Foods' fourth and final point: that Ho's constructive-discharge claim fails as a matter of law. The First Circuit has clarified:

> To take the measure of a claim of constructive discharge, an inquiring court must gauge whether the working conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign. This standard cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held. The ultimate test is one of objective reasonableness. The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins—thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world. Thus, the constructive discharge standard, properly applied, does not guarantee a workplace free from the usual ebb and flow of power relations and inter-office politics.

*Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir.2000) (citations omitted). Ho cannot be said as a matter of law to have failed to adduce sufficient evidence of "working conditions ... [that] had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." Even setting aside Ho's supplemental facts—the introduction of which Barber Foods protests, *see* SJ Reply at 5—Ho demonstrates a pattern in which Pulsoni, one of his supervisors, literally drove him away when he was scheduled, or asked by others, to work on her pack-out line. As demeaning and disruptive as this was, Pulsoni (per Ho's testimony) did not stop there. She comported herself in a manner that a reasonable jury could find to have been cruel, obliging Ho on several occasions to follow her like a dog before she would accept paperwork that she insisted be handed to her personally, and directing that he work on a different, but identical, machine for no apparent reason. This conduct could be deemed to have gone beyond the pale of "ordinary slings and arrows that workers routinely encounter," creating an intolerable working environment.[12]

## IV. Conclusion

For the foregoing reasons, the defendant's summary judgment motion is **GRANTED** as to any claim by Florendo of discrimination due to a failure to promote him to another position within Barber Foods, and otherwise **DENIED**.

---

of the plaintiffs, is inapposite. *See Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 53–54 (1st Cir.1999) (analyzing claims of equitable tolling, continuing violation separately). In addition, *O'Rourke* makes clear that the question in the continuing-violation context is not primarily whether a plaintiff was ignorant of his/her rights, but rather whether the plaintiff had any rights to assert.

**12.** Although the Complaint does not expressly set forth a claim of constructive discharge on Ho's behalf, both Barber Foods and Ho apparently construe it to do so. *See* Motion at 3; Tum SJ Opposition at 1.